DUGAN, J.
¶1 Alberto E. Rivera appeals from a judgment of conviction, entered on a jury verdict, of being a felon in possession of a firearm as a repeater; first-degree intentional homicide with use of a dangerous weapon, as a party to a crime and as a repeater; attempted first-degree intentional homicide with use of a dangerous weapon, as a party to a crime and as a repeater; and two counts of armed robbery with use of force as a party to a crime and as a repeater.[1]
¶2 Rivera argues that the trial court's admission of other acts evidence was prejudicial error.[2] He further argues that there was insufficient evidence for the jury to convict him of first-degree intentional homicide with use of a dangerous weapon, as a party to a crime; and, attempted first-degree intentional homicide with use of a dangerous weapon, as a party to a crime. We disagree and, therefore, affirm.
BACKGROUND
¶3 During the evening of April 8, 2015, in an alley near 1300 South 56th Street in West Allis, Henry Hodges was shot and killed, and his girlfriend Beth was shot in both hands and a bullet grazed her head.[3] Both Hodges and Beth were shot in Hodges' Chevrolet Tahoe.
¶4 On April 16, 2015, Rivera was charged with being a felon in possession of a firearm. On September 3, 2015, Rivera was charged with first-degree intentional homicide with use of a dangerous weapon, as a party to a crime; and attempted first-degree intentional homicide with use of a dangerous weapon, as a party to a crime.
¶5 On November 9, 2015, the State filed a motion to introduce other acts evidence regarding other crimes Rivera committed in 1997 which resulted in his conviction in Milwaukee County case No. 1997CF971820 for a charge of felony murder with the underlying crime being attempted armed robbery, as a party to a crime. The State intended to use the evidence as it related to Rivera's identity, modus operandi, intent, motive, and opportunity. Rivera opposed the motion. The trial court heard oral argument and in a written decision, it denied the motion "with the caveat that the State [could] seek to admit that evidence on rebuttal if the defense put[ ] on affirmative evidence to challenge motive, intent, modus operandi or identity."
¶6 At the final pretrial conference, trial counsel read the following excerpt from the trial court's decision:
Should the defendant put on a defense that directly contests the issue of motive, intent, modus operandi or identity, then the issues ... will become heightened.
Should that occur, then the probative value of the other acts will also be heightened, and then the danger of unfair prejudice may not substantially outweigh that probative value.
Thus the [c]ourt leaves open the possibility that the other acts evidence may be admissible on rebuttal, but advises the parties that the defense will have to directly challenge these issues in its case in chief for the [c]ourt to allow the other evidence on rebuttal.
The trial court then indicated that the parties would not know what was going to occur until the defense's case in chief. The State then said that it "would have to get leave of the [c]ourt before doing anything." Trial counsel then stated that "we'll cross that bridge ... this is the issue that has been previously litigated and may continue to be an issue during the trial."
¶7 The matter proceeded to a four-day jury trial. In its opening statement, the State stated that the testimony and evidence would show that Rivera shot Hodges and Beth. Trial counsel told the jury that the issue in the case was who did the shooting. In other words, it was an "identification case."
The State's case in chief
¶8 Beth testified that at approximately 7:30 p.m. on April 8, 2015, Hodges picked her up in his Tahoe. They were going to get something to eat. Hodges then received a call from Rivera. Hodges said that they needed to stop at Rivera's apartment. Beth had met Rivera five or six times and had been to his apartment near 76th Street and Capitol Drive in Milwaukee.
¶9 When they arrived at Rivera's apartment, Hodges went into Rivera's apartment and Beth waited in the Tahoe. After approximately ten or fifteen minutes, a person walked from the apartment building to the Tahoe. Beth expected the person to be Hodges. However, Rivera appeared at the front passenger side door and told Beth to look under the driver's seat. Beth bent down to look under the seat and saw nothing. When Beth sat up, she saw Rivera pointing a gun with a laser sight at her head. Rivera told Beth to move to the third row seat area of the Tahoe and to keep her head down. Beth moved to the third row on the passenger side and put her head down with her arms crossed near her forehead. Rivera then sat in the second row area on the passenger side with the gun on his lap. Rivera positioned himself so he could see what was going on in the back and he could see Beth. Beth was directly behind Rivera. Beth saw an African-American male enter the driver's seat and drive behind Rivera's apartment building. Rivera then made a phone call and said, "bring him down."
¶10 Soon after, Beth saw Hodges being pushed into the second row area of the Tahoe. Although she did not get a good look at Hodges, she knew that his mouth was covered and he could not walk on his own. Rivera asked Hodges multiple times, "[W]here is the money?" Hodges replied that he did not have any money. Rivera then demanded that they go to Hodges' house to prove that he "didn't have no money there."
¶11 About ten minutes later, the Tahoe arrived at Hodges' house at 35th Street and Greenfield Avenue, and parked in back. A car pulled up along the passenger side of the Tahoe where Rivera was sitting and a "third voice [said] something about they don't have the keys." Rivera said that they had to go back to his apartment to get the keys.
¶12 After a short drive, the Tahoe stopped again. "[Rivera] told [Hodges], let me holler at Ra Ra real quick." Then the door on Beth's side of the Tahoe where Rivera had been sitting opened. Beth heard two shots originating from the second row area where Rivera was seated.
¶13 Beth testified that after the first two shots were fired it felt "like somebody [was] over [her] head." Then she felt someone in the second row seat reach over that seat toward her. Beth heard a shot, followed by a pause, a second shot, and then the door closed. After about two or three minutes, Beth felt blood running down her head and she was "[t]rying to figure out if [she] got shot in [her] head. [She was] [t]rying to see if [Hodges] was fine. [Hodges] did not move when [she] called his name."
¶14 Beth got out of the Tahoe, ran to a nearby house, and the occupant called 911. The police arrived and transported Beth to the hospital, where she was treated for gunshot wounds to both of her hands and a bullet graze to her head. On the way to the hospital, Beth told the police that Rivera was the shooter.
¶15 Beth was shown a photograph of Rivera and she identified him as the shooter with 100% certainty. Four months after the shooting, Beth identified Rivera as the shooter in a lineup.
¶16 Hodges was shot in the head and the left knee. Both bullets passed through his body. The medical examiner estimated that the gun used to shoot Hodges discharged from a distance of about "a few inches to maybe a foot" from Hodges' head. Hodges' hands and legs had been bound with extension cords, and duct tape covered his mouth.
¶17 Wisconsin State Crime Laboratory fingerprint examiners obtained a fingerprint from a cardboard tape roll that the police found in Rivera's kitchen and determined that the fingerprint belonged to Levell Drew.[4] The police showed Beth a photo array that included Drew's photo, but she did not identify Drew as being involved in the incident.
Rivera's testimony
¶18 Rivera was the only defense witness. During his direct examination, Rivera stated that he had been convicted of felony murder in March 1997 because he and a co-actor had attempted to rob the co-actor's father's drug supplier and Rivera shot and killed the drug supplier by accident. Rivera provided details about the 1997 felony murder, explaining the plans for the robbery, how he and his co-actor lured the supplier to the co-actor's house, and how Rivera shot the drug supplier twice in the supplier's car.[5]
¶19 Rivera stated that he met Hodges in about 2008 when they were in prison and that, after Rivera's release from prison, they sold drugs together. Hodges supplied the drugs, Rivera sold them, and then Rivera paid Hodges.
¶20 With regard to the charges, Rivera testified that he did not shoot Hodges or Beth, that he did not get into the Tahoe, and that he was not in the Tahoe at Hodges' house. Rivera said that on the night of the shooting, he called Hodges and asked him to bring drugs to Rivera so that he could sell them the following day. When Rivera made that call, his friends Terrance Jackson, known as "Ra Ra," and Drew were at the apartment to buy drugs. Then Rivera got a call from a buyer who wanted to buy drugs and left to meet the buyer. Drew and Jackson remained at the apartment.
¶21 According to Rivera, when he returned to the apartment no one was there, the door was open, and the lights were off. Rivera found keys on the kitchen counter and called Jackson to find out where he had gone. Jackson told Rivera to meet him near 35th Street and Greenfield Avenue. Rivera drove to that location and saw Jackson get out of the driver's side of Hodges' Tahoe. Jackson told Rivera to follow him and got back into Hodges' Tahoe. Jackson drove to an alley; and Rivera followed. Jackson got out of the Tahoe, opened the rear passenger door, and fired two shots inside. As Jackson was walking toward the car Rivera was in, Rivera saw another flash through the back window of the Tahoe. Jackson then got into the car that Rivera was driving, and Drew exited the rear passenger door of the Tahoe and got into the car with Rivera and Jackson. Rivera drove Jackson and Drew back to Rivera's apartment.
¶22 The State extensively cross-examined Rivera about the 1997 homicide. It questioned him about the plan, which used a prior relationship between his co-actor's father and the drug supplier to arrange the drug deal. The State also questioned Rivera about holding the drug supplier at gunpoint in the supplier's car, not allowing the drug supplier to leave the car, shooting the supplier twice, and not turning himself into the police.
The trial court's question
¶23 After Rivera's testimony ended and the defense had rested, the trial court asked, "So that was a strategic decision by the defense to bring up the 1997 case?" Trial counsel responded:
It was a strategic decision in light of the prior [c]ourt's decision in this case. That were the defendant to offer a defense of just about anything, that that would then come into play.
In other words, absence of intent, mistake, motive, that the [S]tate could then bring that up. So yes, the best defense is a good offense was the thought-out plan of Mr. Rivera and I. That we would bring it up.
Trial counsel further stated that the trial court had denied the motion to admit the other acts evidence with the exception that if Rivera "presented a defense, that would implicate any of the Whitty[6 ] standards, that then the State would be able to bring in any information."[7] (emphasis added). The State responded that trial counsel "had it right."[8]
The verdict and sentencing
¶24 The jury found Rivera guilty of first-degree intentional homicide with use of a dangerous weapon, as a party to a crime; and attempted first-degree intentional homicide with use of a dangerous weapon, as a party to a crime. At sentencing, the trial court imposed life imprisonment without eligibility for extended supervision for the first-degree intentional homicide with use of a dangerous weapon, as a party to a crime; and twenty years of initial confinement followed by ten years of extended supervision for the attempted first-degree intentional homicide with use of a dangerous weapon, as a party to a crime, consecutive to the sentence imposed on count one and any other sentences. This appeal followed.
DISCUSSION
¶25 Rivera argues that it was prejudicial error for the trial court to allow the admission of other acts evidence. He further argues that the evidence was insufficient for the jury to convict him of either charge. We disagree.
I. The standard of review and applicable law
Admission of other acts evidence
¶26 Our review of an evidentiary ruling is limited to determining whether the trial court properly "exercised its discretion in accordance with accepted legal standards and the facts of record." See Chomicki v. Wittekind , 128 Wis. 2d 188, 195, 381 N.W.2d 561 (Ct. App. 1985). When a trial court has not set forth its reasoning, we "independently review the record to determine whether it provides a basis for the [trial] court's exercise of discretion." See State v. Sullivan , 216 Wis. 2d 768, 781, 576 N.W.2d 30 (1998).
¶27 In State v. Marinez , 2011 WI 12, ¶19, 331 Wis. 2d 568, 797 N.W.2d 399, our supreme court succinctly set forth the three-prong test established in Sullivan that Wisconsin state courts should apply to determine whether other acts evidence is admissible for a proper purpose under WIS. STAT. § 904.04(2)(a). Evidence of other acts may be admitted (1) if offered for a permissible purpose pursuant to § 904.04(2)(a), (2) if it satisfies the two relevancy requirements in WIS. STAT. § 904.01, and (3) "if its probative value is not substantially outweighed by the risk or danger of unfair prejudice under WIS. STAT. § 904.03." Marinez , 331 Wis. 2d 568, ¶19.
¶28 The party seeking to admit the other acts evidence bears the burden of establishing that the first two prongs are met by a preponderance of the evidence. See State v. Payano , 2009 WI 86, ¶¶63, 68 n.14, 320 Wis. 2d 348, 768 N.W.2d 832. Once the proponent of the other acts evidence establishes the first two prongs of the test, the burden shifts to the party opposing the admission of the other acts evidence to show that the probative value of the evidence is substantially outweighed by the danger of unfair prejudice. Id. , ¶80.
Sufficiency of the evidence
¶29 State v. Poellinger establishes the standards that we apply when reviewing the sufficiency of the evidence to support a conviction as follows:
[We] may not substitute [our] judgment for that of the trier of fact unless the evidence, viewed most favorably to the [S]tate and the conviction, is so lacking in probative value and force that no trier of fact, acting reasonably, could have found guilt beyond a reasonable doubt. If any possibility exists that the trier of fact could have drawn the appropriate inferences from the evidence adduced at trial to find the requisite guilt, an appellate court may not overturn a verdict even if it believes that the trier of fact should not have found guilt based on the evidence before it.
See id. , 153 Wis. 2d 493, 507, 451 N.W.2d 752 (1990) (internal citations omitted). Additionally,
[i]n reviewing the sufficiency of circumstantial evidence to support a conviction, [we] need not concern [ourselves] in any way with evidence which might support other theories of the crime. [We] need only decide whether the theory of guilt accepted by the trier of fact is supported by sufficient evidence to sustain the verdict rendered.
See id. at 507-08.
II. The evidence of Rivera's 1997 other acts satisfies the Sullivan test
¶30 As noted, the parties construed the trial court's decision as allowing the State to introduce evidence of Rivera's 1997 other acts to establish the identity of the shooter, but only on rebuttal if Rivera introduced identity as a defense. Although Rivera introduced the evidence, he did it preemptively. See State v. Gary M.B. , 2004 WI 33, ¶18, 270 Wis. 2d 62, 676 N.W.2d 475. Since the trial court did not explicitly set forth its reasoning on the record, we examine the record to determine whether it provides a basis for the trial court's exercise of discretion. See Sullivan , 216 Wis. 2d at 781 ; see also State v. Rutchik , 116 Wis. 2d 61, 74 n.6, 341 N.W.2d 639 (1984).
The first prong-permissible purpose
¶31 The State sought to introduce evidence of Rivera's 1997 felony murder to establish his identity as the shooter in the intentional homicide and attempted intentional homicide in this case. See WIS. STAT. § 904.04(2)(a). Rivera's defense clearly made identity a central issue in the case when he testified that Jackson and Drew committed the crimes and that his involvement was limited to seeing Jackson shoot into the Tahoe, and driving the getaway car. Therefore, the evidence was offered for the acceptable purpose of establishing the identity of the person who shot Hodges and Beth. Rivera does not contest that the evidence was offered for the purpose of establishing identity.
The second prong-relevance
¶32 The second prong is whether the evidence is relevant. The relevancy analysis has two requirements. See Marinez , 331 Wis. 2d 568, ¶19. The first requirement is that the other acts were offered to help prove a "fact [or proposition] that is of consequence to the determination of" Rivera's guilt or innocence. See WIS. STAT. § 904.01.
¶33 We conclude that pursuant to WIS. STAT. § 904.01, the trial court could reasonably determine that the other acts were probative with respect to Rivera's identity defense that Jackson and Drew committed the crimes and that he was unaware of what they were doing until it was too late. To be admissible for the purpose of identity, the other acts evidence should have such a concurrence of common features and so many points of similarity with the crime charged that it "can reasonably be said that the other acts and the present act constitute the imprint of the defendant."[9] State v. Fishnick , 127 Wis. 2d 247, 263-64, 378 N.W.2d 272 (1985). The threshold measure for similarity with regard to identity is "nearness of time, place, and circumstance of the other act to the crime alleged." Id. at 264 n.7. Whether there is a concurrence of common features is generally left to the sound discretion of the trial court. Id.
¶34 The other acts evidence from 1997 consisted of Rivera aiding his co-actor in luring the co-actor's father's drug supplier to a particular location with a promise to buy drugs. But instead of buying drugs, Rivera and the co-actor worked together to hold the supplier hostage in his car while they searched him and a nearby house for money and drugs. When they found nothing, Rivera shot the drug supplier twice and went on the run. After learning from his mother that the police were looking for him, Rivera did not turn himself in. He was eventually arrested during a traffic stop.
¶35 Here, there were significant parallels between Rivera's 1997 conduct and his conduct in this case. Here, Rivera called Hodges, his drug supplier, and asked him to come to Rivera's apartment and supply him with drugs to sell. When Hodges arrived, Rivera and his co-actors brought him back to his car, where they held him hostage at gunpoint. They drove to Hodges' residence to search for drugs and money. In 1997, Rivera shot the drug supplier twice. Here, Rivera shot Hodges, his drug supplier, twice and left him in the Tahoe.[10] After learning from his mother that the police were looking for him to talk about a shooting, he did not turn himself in. Rather, he went on the run to Green Bay to evade the police.
¶36 Furthermore, in determining the nearness in time between the prior acts and the crimes charged we do not consider time spent in confinement. See State v. Murphy , 188 Wis. 2d 508, 519, 524 N.W.2d 924 (Ct. App. 1994). Here, Rivera was released from prison in November 2013, only about a year and one-half before the April 8, 2015 crimes occurred.
¶37 Given this time element and the concurrence of common features and the points of similarity between the 1997 other acts and the charged crimes, the record provides a reasonable basis for the trial court to conclude that the evidence was relevant to establish Rivera's identity as the perpetrator of the offenses charged in this case. See id. at 519-20. Thus, the State's other acts evidence satisfies the first requirement of the relevancy analysis because it was offered to help prove a "fact [or proposition] that is of consequence to the determination of" Rivera's guilt or innocence. See WIS. STAT. § 904.01.
¶38 The other acts evidence also satisfies the second requirement of the relevancy test. Its admission made the State's claim-that Rivera shot Hodges and Beth-more probable than it would have been without the evidence. It also made Rivera's claim-that Jackson was the shooter and that the crimes were committed by Jackson and Drew-less probable than it would have been without the evidence. See id .
The third prong-probative value and unfair prejudice
¶39 Under the third prong, pursuant to WIS. STAT. § 904.03, the trial court could also reasonably determine that the probative value of the evidence of Rivera's 1997 other acts was not substantially outweighed by the danger of unfair prejudice to Rivera. " '[S]ubstantially' indicates that if the probative value of the evidence is close or equal to its unfair prejudicial effect, the evidence must be admitted. " Payano , 320 Wis. 2d 348, ¶80 (citation omitted).
¶40 Regarding unfair prejudice, Rivera argues that the State's closing argument emphasized the 1997 homicide.[11] We disagree. When the State discussed the 1997 other acts, it stressed that the jury was to consider that conduct only in regard to the issue of identity. The State said, "When you're using the 1997 case, [you should consider] whether the prior conduct of the defendant is so similar to the offense charged that it tends to identify the defendant as the one who committed the offense charged[.]" The State emphasized, "[Y]ou should not go back there and say well, he did it once, that's it[.]... It cannot be considered as he's a bad guy or he's a killer. It never must be done. That's not the way it works."
¶41 Moreover, the trial court provided the jury with a cautionary instruction that it was to use the evidence for the purposes for which it was admitted. It informed the jury that "[i]t's not to be used to conclude that the defendant's a bad person and for that reason is guilty of the offense charged." The jury is presumed to "comply with properly given limiting and cautionary instructions[.]" See State v. Hurley , 2015 WI 35, ¶92, 361 Wis. 2d 529, 861 N.W.2d 174. Here, the jury was properly instructed on the limited use of the evidence. Thus, we conclude that the record establishes that the admission of the other acts evidence was not an erroneous exercise of discretion.[12]
III. Sufficient evidence supports Rivera's homicide and attempted convictions
¶42 Rivera argues that the direct evidence does not show who fired shots and that circumstantial evidence does not establish that he was the shooter.
¶43 To prove first-degree intentional homicide, the State had to prove that Rivera caused the death of Hodges and acted with the intent to kill. See WIS. STAT. § 940.01(1)(a). To prove attempted first-degree intentional homicide, the State had to prove that Rivera had the requisite intent and did acts toward the commission of the crime of first-degree intentional homicide as to Beth, which "demonstrate unequivocally, under all the circumstances, that [Rivera] formed that intent and would [have] commit[ted that] crime except for the intervention of another person or some other extraneous factor." See WIS. STAT. § 939.32(3).
¶44 Moreover, both counts were charged as a party to a crime. "Whoever is concerned in the commission of a crime is a principal and may be charged with and convicted of the commission of the crime although the person did not directly commit it." See WIS. STAT. § 939.05. While Rivera argues that the evidence was not sufficient to prove that he actually fired the shots that killed Hodges and injured Beth because Beth did not see him actually shoot, we emphasize that Rivera was charged as a party to a crime to both counts. Thus, even though the State's theory was that Rivera did the actual shooting, to return guilty verdicts the jury only had to believe that Rivera was "concerned in the commission" of the shooting of Hodges and Beth. See § 939.05.
¶45 "It is well established that a finding of guilt may rest upon evidence that is entirely circumstantial and that circumstantial evidence is oftentimes stronger and more satisfactory than direct evidence." Poellinger , 153 Wis. 2d at 501. Beth provided detailed testimony about Rivera's continuing and dominant role in the sequence of events that culminated with the shootings. Rivera's defense was in direct conflict with Beth's familiarity with Rivera, his pointing the gun at her, and the fact that she periodically heard his voice in the vehicle during the entire course of the events of April 8, 2015.
¶46 Based on Beth's testimony, noted above, the jury could conclude that Rivera was actively involved in the entire incident from the time he called Hodges asking him to deliver some drugs until the last shot was fired. Her testimony established that Rivera appeared, pointed the gun at her head, and ordered her to move to the third row seat area of the Tahoe and keep her head down. He then positioned himself in the second row seat area in front of Beth with the gun in his lap and ordered a co-actor to bring Hodges down to the Tahoe. After that Rivera asked Hodges multiple times where the money was located. Then, when no money was found in the Tahoe, Rivera demanded that they go to Hodges' house to prove that he "didn't have no money there."
¶47 After a short drive the Tahoe stopped, the back door on Beth's side of the Tahoe where Rivera was sitting opened, and Beth heard two shots originating from the second row area where Rivera was seated. The shots came from where Rivera had been seated the whole time. When asked on cross-examination if she knew who the shooter was, Beth said that she did-it was Rivera. As noted above, Beth also testified about the details of how she was shot.
¶48 Beth's testimony was evidence from which the jury could reasonably infer that Rivera remained in the Tahoe with a gun in a position where he could and did shoot both Hodges and Beth. Furthermore, even if a co-actor had fired the shots, there is abundant evidence that Rivera was concerned in the commission of the crimes. The evidence provided by Beth, together with the other evidence implicating Rivera, demonstrates that more than sufficient evidence supports the jury's guilty verdicts.
¶49 In sum, sufficient evidence supports the jury's finding that Rivera was guilty of first-degree intentional homicide with use of a dangerous weapon, as a party to a crime; and attempted first-degree intentional homicide with use of a dangerous weapon, as a party to a crime.
CONCLUSION
¶50 For the foregoing reasons, the judgment is affirmed.
By the Court. -Judgment affirmed.
Not recommended for publication in the official reports.

Although Rivera appeals the judgment of conviction, his initial appellate brief states that the appeal is limited to challenging his convictions of first-degree intentional homicide with use of a dangerous weapon, as a party to a crime, and attempted first-degree intentional homicide with use of a dangerous weapon, as a party to a crime. Therefore, we do not further discuss the three other crimes. We also do not further mention that Rivera was convicted as a repeater for both of the homicide charges.

The Honorable Ellen R. Brostrom issued a pretrial decision on the State's other acts evidence motion. As of August 2, 2016, the Honorable Jeffery A. Wagner presided over the action, including subsequent pretrial proceedings, the jury trial, and the sentencing. We refer to the courts collectively as the trial court.

The State uses Beth as a pseudonym, pursuant to Wis. Stat. Rule 809.86(4) (2017-18), for the victim of the offense of attempted first-degree intentional homicide, with use of a dangerous weapon, as a party to a crime. We also refer to that victim as Beth. We also note that the testimony uses "arms" and "hands" interchangeably when referring to Beth's injuries.
All references to the Wisconsin Statutes are to the 2017-18 version unless otherwise noted.

The police seized the cardboard tape roll from Rivera's apartment when they executed a search warrant for the premises.

As we further explain, the parties interpreted the trial court's other acts evidence ruling as meaning that if Rivera offered any defense other than that the State had not met its burden of proof, the other acts evidence would be admissible. Therefore, trial counsel and Rivera made a strategic decision to present the evidence first.

See Whitty v. State , 34 Wis. 2d 278, 292, 149 N.W.2d 557 (1967).

Since the parties do not dispute the issue we do not examine if their interpretation of the trial court's ruling is correct.

Although the parties agree that the trial court ruled that if Rivera introduced evidence "to challenge motive, intent, modus operandi, or identity" the State could introduce evidence of Rivera's 1997 other acts, the arguments on appeal relate solely to identity.

Rivera cites State v. Kuntz , 160 Wis. 2d 722, 749, 467 N.W.2d 531 (1991), for the proposition that when other acts evidence is being admitted to prove identity, trial courts must use stricter standards of probativeness and relevancy because of "the greater prejudice that accompanies such evidence." Kuntz actually states, "the greater prejudice that usually accompanies such evidence." Id. (emphasis added). Rivera also fails to develop an argument on the issue, and, therefore, we decline to further address it. See State v. Pettit , 171 Wis. 2d 627, 646-47, 492 N.W.2d 633 (Ct. App. 1992).

Here, a second person had accompanied Hodges that evening and was also shot twice and left in the Tahoe.

This portion of the State's argument represents just over one page of the twenty-page transcript of the State's closing.

Our conclusion that it was not error resolves Rivera's harmless error argument.